Matter of Waite v Town of Champion (2018 NY Slip Op 04688)

Matter of Waite v Town of Champion

2018 NY Slip Op 04688 [31 NY3d 586]

June 27, 2018

Rivera, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, September 16, 2018

[*1]

In the Matter of Jennifer Waite et al., Appellants,
v
Town of Champion, Respondent.

Argued June 7, 2018; decided June 27, 2018

Matter of Waite v Town of Champion, 148 AD3d 1634, affirmed.

{**31 NY3d at 588} OPINION OF THE COURT

Rivera, J.

In this CPLR article 78 proceeding, petitioners claim that respondent failed to accomplish and complete the dissolution of the Town of Champion Fire Protection District as required by the General Municipal Law. On the facts of this case, we conclude that respondent's actions are not affected by an error of law because it prepared, approved, and implemented a dissolution plan in compliance with the applicable statutory requirements, and lawfully created two legally distinct fire protection districts to deliver fire protection services to the Town of Champion residents, in accordance with Town Law § 170.
I. Statutory Background
In 2009, the legislature enacted the "New N.Y. Government Reorganization and Citizen Empowerment Act" (Act), codified as General Municipal Law article 17-a, in order to "establish[ ] uniform and user-friendly procedures for local government entities to consolidate or dissolve" (Sponsor's Mem, Bill Jacket, L 2009, ch 74 at 6, 2009 McKinney's Session Laws of NY at 1528). As relevant to this appeal, title 3 of the Act provides that a local government entity other than a town may be dissolved through a dissolution proceeding, initiated by the entity's governing body or directly by its electors (see General Municipal Law § 773). For the electors to initiate a dissolution proceeding, a specified fraction of the local [*2]government entity's{**31 NY3d at 589} electorate must sign a petition substantively conforming to language specified in the Act and calling for a referendum (see General Municipal Law § 779). The referendum on the entity's continued existence is then put to a vote at a special or general election (id. § 780). If the referendum passes by majority vote, the governing body of the local government entity subject to the referendum must prepare and approve a "dissolution plan," which specifies, among other things, "the manner and means by which the residents of the entity will continue to be furnished municipal services following the entity's dissolution" (id. § 782 [2] [i]). The dissolution plan must also spell out "terms for the disposition of the entity's assets . . . liabilities and indebtedness," as well as the date on which it shall become effective (id. § 782 [2] [j], [l]).
Thereafter, the governing body must make the plan available for public inspection and hold public hearings, upon reasonable notice, so that the public at large has an opportunity to comment on the proposed dissolution (see id. §§ 782, 784). After the hearings, the governing entity must approve a final version of the dissolution plan. If, as a result of public comment, the plan is amended, it must be publicly posted anew before the final vote (see id. § 784). After its ultimate approval, the dissolution plan takes effect on the date specified, which by statute must be at least 45 days after the final vote, unless implementation is forestalled under the Act (see id. § 785).
In particular, the Act allows electors to subject the implementation of an elector-initiated dissolution plan to a "permissive referendum" (id.). Thus, if electors are dissatisfied with a proposed dissolution plan, apart from airing their concerns through the public hearing and participation process, they may, by obtaining a specified number of signatures, petition to put a referendum question to the electorate as to whether the dissolution plan should take effect (see id.).[FN1] If they gather enough signatures to trigger a permissive referendum, the dissolution plan goes into effect only if a majority vote in its favor (see id.). Moreover, where the local governing body "fails to prepare and approve [a dissolution] plan or is otherwise unable{**31 NY3d at 590} or unwilling to accomplish and complete the dissolution," "five electors who signed the petition seeking dissolution may commence a special proceeding against the entity pursuant to article [78] . . . to compel compliance" (id. § 786 [1]).
The instant appeal concerns the dissolution of a fire protection district (FPD), one of two local entities a town may create to facilitate provision of fire protection services to the town's residents. Upon its creation of an FPD, the town board, as the town's governing body, assumes the duty to provide fire protection through volunteer and paid firefighters. To that end, it may "contract with any city, village, fire district or incorporated fire company . . . for the furnishing of fire protection" (Town Law § 184 [1]). These contracts are paid for by an assessment on the FPD, which, according to the State Comptroller, must be uniform across the FPD (1981 Ops St Comp No. 81-311). FPD taxes must be administered by the town "in the same manner, at the same time and by the same officers as [are] town taxes" (Town Law § 184 [6]), and the town may ultimately be liable for the negligence of its firefighting personnel (see Nelson v Garcia, 152 AD2d 22, 24-25 [4th Dept 1989]).
Alternatively, a town board may choose to create a fire district (FD) to provide fire protection services. An FD, unlike an FPD, is a distinct "political subdivision of the state and a district corporation within the meaning of section three of the general corporation law" in its own right (Town Law § 174 [7]).[FN2] Its "officers and employees . . .[*3], including the paid and volunteer members of the fire department thereof, are officers and employees of such [FD] and are not officers or employees of any other political subdivision" (id.; see also Nelson, 152 AD2d at 25 [observing that an FD is "a wholly independent political subdivision whose 'members', including its volunteer fire(fighters), are employees of the (FD) and not of the town"]). An FD is headed by independent commissioners who devise the FD's budget, which, when approved, is independently implemented by the county's board of supervisors (see Town Law §§ 174, 181). In addition, an FD's commissioners have the power to set differential tax rates across the FD, charging FD residents different{**31 NY3d at 591} amounts based on the specific cost of providing them with fire protection services (see id. § 176 [27]).
Both an FPD and an FD may be created by "the town board of any town" "[u]pon its own motion and without a petition" (id. § 170 [2]). They may also be initiated by petition, if "resident[-]taxpayers owning taxable real property aggregating at least one-half of the assessed valuation of all the taxable real property of the proposed district" so request (id. § 171 [1]). Filing an appropriate petition does not guarantee the creation of an FPD or FD, because the proposal must go through a public comment period, and is subject to approval or disapproval in the discretion of the town board (see id. § 171 [3]).
II. Factual and Procedural Background
Petitioners are five resident-electors and legal voters of respondent Town of Champion (Town) and signatories to a Petition for Local Government Dissolution pursuant to General Municipal Law § 779 (Petition), which demanded a referendum on the dissolution of the Town of Champion Fire Protection District (CFPD). The Town is a municipal corporation in Jefferson County, mostly covered by the CFPD,[FN3] and governed by the Town Board. To provide fire protection in the CFPD, the Town contracted with three separate fire departments—the local Champion Volunteer Fire Company, and the fire departments of the neighboring villages of West Carthage and Copenhagen.
Upon confirmation that the Petition contained sufficient signatures, the Town Board resolved to call for a referendum to ask whether the CFPD should be dissolved. The referendum was held, and its passage was announced at a Town Board meeting. At a follow-up meeting, the Town Board presented and approved a Plan for Dissolution (Plan) pursuant to General Municipal Law § 782. The Plan provided for the dissolution of the existing CFPD and the creation of two new FPDs, which would cover the same geographic area as the CFPD. Under the Plan, the Town would enter separate contracts for each FPD for the provision of fire protection services, specifically a contract with the fire department of the Village of West Carthage to provide services in FPD 1, and a contract with the{**31 NY3d at 592} fire department of the Village of Copenhagen for services in FPD 2. After a subsequent special meeting of the Town Board and public hearings, the Board approved three resolutions: the dissolution of the CFPD, and, separately, the creations of FPDs 1 and 2. The Board resolutions were thereafter filed with the County Clerk and New York's Department of State, as is required of all resolutions dissolving, establishing, or altering FPDs (see Town Law § 173).
Petitioners disapproved of the Plan and a petition was circulated calling for a referendum on whether the Plan should take effect, but the petition failed to garner sufficient valid signatures. Simultaneously, petitioners filed this article 78 proceeding pursuant to General Municipal Law § 786, challenging the Plan and the creation of the [*4]two FPDs. Petitioners sought a declaration that the Plan was void and an order directing the Town to comply with the Act by adopting a dissolution plan that did not involve the creation of an FPD controlled by the Town Board.
Supreme Court dismissed the petition, holding that the Town followed the required procedures and acted within its authority to determine whether to create an FD or an FPD. The Appellate Division affirmed, concluding that the Town complied with the Act, and observing that petitioners failed to attain enough signatures to challenge the Plan by referendum or to petition for the establishment of an FD (see 148 AD3d 1634, 1634 [4th Dept 2017]). We granted petitioners leave to appeal (29 NY3d 912 [2017]).
III. The Town's Compliance with its Statutory Obligations
Petitioners allege that the Town acted contrary to law because the Town Board never dissolved the CFPD but instead divided it in half, and in so doing maintained control over the provision of fire protection services, against the will of the voters and in violation of the Act. Petitioners request that we vacate the Plan and instruct the Town Board to adopt one that conforms with the Act. The Town counters that it has complied with all the applicable statutory procedural requirements to dissolve the CFPD, and that it created the two FPDs pursuant to law.
In this article 78 proceeding to compel compliance with the provisions of the Act, we review the Town's actions to determine whether they were "affected by an error of law" (Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs., 77{**31 NY3d at 593} NY2d 753, 758 [1991] [citations omitted]). To prevail, petitioners must establish "a clear legal right to the relief demanded" by demonstrating the "exist[ence of] a corresponding nondiscretionary duty" on the part of the Town (id. at 757 [citations omitted]).
Here, the Town fully and properly complied with all the requirements of the Act to dissolve the CFPD. Upon receipt of the Petition, the Town Board held a referendum and upon passage of the referendum the Town Board proposed a dissolution plan, which, after public hearing, was voted on and approved. The CFPD was dissolved pursuant to the Plan on August 10, 2015, effective December 31, 2015, and no winddown was necessary as the CFPD did not have employees, assets, or liabilities. The petitioners' assertion that there was no dissolution of the CFPD is thus factually inaccurate.
Moreover, in accordance with its legal duty to provide public services, including, as relevant here, fire protection services, the Town Board created two new separate FPDs, coterminous with the CFPD, but functionally distinguishable. The Town contracted with the fire departments of separate villages to provide fire protection services within the geographic boundaries of each FPD. This was all done in compliance with the Town Law and without contravening the intent of the Act.
Nevertheless, petitioners allege that this was mere technical compliance with the statutory mandates and did not constitute a proper dissolution within the meaning of the Act because the Town Board essentially adopted an organizational structure that the majority of electors sought to dissolve. According to petitioners, the Town Board undermined the will of the voters by retaining control over the provision of fire protection services in the new FPDs, as it had in the CFPD.
We are unpersuaded by petitioners' argument as it is based on a misunderstanding of the statutory framework, the purpose of the Act, and the Town Board's authority to choose the manner by which to provide fire protection services to the Town's residents. The Town Board is empowered to create an FPD (see Town Law § 170 [2]), and the Town Board's decision to deliver the services formerly provided by the CFPD by creating two FPDs was a proper exercise of its municipal authority to choose between an FPD and an FD (see id. [empowering "the town board of any town" to "establish or extend (FDs) or (FPDs) in such town or towns outside of any incorporated village or city{**31 NY3d at 594} or existing (FD, FPD, or fire alarm district), after a public hearing thereon" "(u)pon (the town board's) own motion and without a petition"]). Nothing in the Act limits that power or prevents the Town Board from making this choice. The courts are thus without authority to upset what the Town Board determines to be the proper government organization for its municipal residents and the best way to deliver fire protection services.[FN4]
Contrary to petitioners' argument that the Town Board did not actually dissolve the CFPD because all it did was divide the CFPD in two, there are material differences between the CFPD, and FPD 1 and FPD 2. FPD 1 and 2 each cover their own respective geographic area. That together their boundaries are coterminous with those of the CFPD prior to its dissolution does not change the fact that they each encompass a smaller discrete area than that of the CFPD. This change is factually and legally meaningful. Although the Town Board will ultimately remain responsible for entering into contracts to secure fire protection services on behalf of the Town, as it did before, the form and operation of those contracts will be materially different. In particular, tax rates in an FPD must be uniform across the FPD (1981 Ops St Comp No. 81-311). This means that all residents must face similar assessments, even if fire protection services are provided by multiple companies, and the cost of fire protection differs across the FPD. In the CFPD, residents were required to pay the same assessment, regardless of whether they were covered by a fire company from the Town of Champion or the villages of Copenhagen or West Carthage. The new FPDs, however, disaggregate these costs. One FPD is entirely covered by the village of Copenhagen's fire department, the other by West Carthage's. The cost in each FPD may be different, then, as assessments in that FPD will exclusively reflect the cost of providing fire services to those residents alone. Indeed, "the cost of separate fire protection {**31 NY3d at 595}contracts [through separate FPDs] within a town may not be lumped [together] as a single tax" and each FPD must instead be treated as "a separate taxing area" (1982 Ops St Comp No. 82-313). In other words, even though the Town Board will maintain control over both FPDs and the Town may potentially be liable in tort for harms caused by firefighting personnel in each, FPD 1 and FPD 2 will, at a minimum, have different tax bases than the CFPD. We therefore have no occasion to opine on whether a merely technical compliance with the Act, which does not lead to any actual changes in government operations, would survive judicial scrutiny.[FN5]
Petitioners claim that this result thwarts both the intent of the voters, because the electorate voted to dissolve the CFPD and the Town Board responded by creating two new FPDs, as well as the intent of the Act, as the creation of two FPDs is a proliferation of local government entities contrary to the purpose of the Act to help New Yorkers dissolve and consolidate government entities. Their claim is unconvincing upon a careful consideration of the Act's requirements. The Act establishes a procedure to effectuate the reduction of extraneous government entities. That procedure was followed here and the replacement configuration does not appear to be extraneous, but rather a choice [*5]to continue to provide fire services through an FPD rather than an FD. That choice is a political one, allowed for under the Act.[FN6]
Petitioners have a remedy if they are dissatisfied with the Town Board's choice: they can seek to dissolve the FPDs through an elector-initiated referendum, as they did with the CFPD, or they can petition for the establishment of an FD. Petitioners' failure to secure the former or to pursue the latter{**31 NY3d at 596} approach cannot serve as a basis to void the Town's properly implemented Plan for dissolution. The Act and local political structure have worked as intended, and the Town's actions were not "affected by an error of law" (Scherbyn, 77 NY2d at 758; CPLR 7803 [3]).
Accordingly, the Appellate Division order should be affirmed, with costs.

Fahey, J. (dissenting). To divide is not to dissolve. Here, respondent, the Town of Champion, merely replaced the subject fire protection district (FPD) with two substitute FPDs and therefore did not comply with its statutory obligation to dissolve and terminate the FPD. Consequently, I respectfully dissent and would reverse the Appellate Division order and grant the petition.
Background
The Town of Champion is located in Jefferson County, just east of the City of Watertown. The Champion Fire Protection District was formed in 1953 to protect the citizens of that town, and fire protection services subsequently were procured by contracts with fire departments in various neighboring municipalities and fire [*6]departments, including the Village of West Carthage, the Village of Copenhagen, and the Champion Volunteer Fire Company, Inc.[FN1]
In or about 2014, however, the electors of the Town of Champion Fire Protection District (hereinafter, the FPD) commenced a proceeding pursuant to General Municipal Law § 779 seeking the dissolution of the FPD through a referendum. Upon determining that the petition contained sufficient signatures, respondent's town board resolved to hold a referendum with respect to the dissolution question on December 9, 2014.
A majority of referendum electors voted in favor of dissolution, and that vote triggered a responsibility on the part of respondent to approve a proposed elector initiated dissolution plan (see General Municipal Law § 782). The plan, however, was drawn with sleight of hand: under that proposal, the FPD was to be "dissolved" and residents would continue to receive {**31 NY3d at 597}services by the formation of two new fire protection districts covering the same geographic territory as the FPD.[FN2]
Following public hearings regarding the dissolution plan, the board adopted that scheme and created two "new" FPDs to replace the "dissolved" FPD (see Town Law § 170). Following that vote, petitioners commenced this proceeding pursuant to CPLR article 78 seeking a judgment nullifying respondent's elector initiated dissolution plan as contrary to General Municipal Law § 773 on the ground that the plan did "not propose to accomplish the actual dissolution of the [FPD]." After issue was joined, Supreme Court granted the motion and dismissed the petition, ruling "that appropriate procedures were followed by [respondent] and [that respondent] had followed appropriate steps in making a determination which was the 'job of the elected officials to [make].' " On appeal, the Appellate Division affirmed the judgment dismissing the petition, noting that "respondent . . . fulfilled its duty of devising a dissolution plan" (148 AD3d 1634, 1634 [4th Dept 2017]).
Analysis
This Court subsequently granted petitioners leave to appeal (29 NY3d 912 [2017]), and it now affirms the Appellate Division order, essentially on the ground that to divide the FPD into two FPDs covering the same geographic territory was to adhere to the statutory obligation to "dissolve[ ] and terminate[ ]" the FPD (General Municipal Law § 773 [1]; see majority op at 
593-594). I respectfully disagree with that conclusion.
My review begins with General Municipal Law article 17-a, which is entitled "Consolidation and Dissolution of Local Government." Section 773 (1) of the General Municipal Law provides that "[a] local government entity other than a town may be dissolved and terminated" pursuant to procedures including "elector initiative" (§ 773 [2] [b]). To the extent dissolution is sought pursuant to the initiative of electors, those electors must follow the steps set forth in General Municipal Law § 779, which provides, among other things, that a dissolution proceeding may be commenced by the filing of an original{**31 NY3d at 598} petition, together with the signatures of the lesser of 10% of the electorate or 5,000 electors. To the extent the requirements of that section are met, a referendum on the proposed [*7]dissolution shall be placed before the electorate within a period of 60 to 90 days after the enactment of the resolution calling for the referendum (§ 780).
To the extent a majority of the electorate voting at the referendum favors dissolution, the entity's governing body shall meet within 30 days of the favorable vote and, within 180 days of that vote, also shall approve an elector initiated dissolution plan (§ 781). Section 773 (1) of the General Municipal Law reflects that the "target" entity is to be "dissolved and terminated."
Save for dissolution and termination, all of those criteria were met here. The question thus becomes whether what respondent characterizes as the dissolution of the FPD, and the immediate replacement of that entity with two FPDs, is a "dissol[ution] and terminat[ion]" within the meaning of the General Municipal Law (and therefore a legal course of action).
Statutory Interpretation
The resolution of the foregoing question turns on the meaning applied to the word "dissolution," as it is incorporated in article 17-a of the General Municipal Law. That term is defined in General Municipal Law § 750 (5), which provides that " '[d]issolution' shall mean the termination of the existence of a local government entity."
Put simply, on these facts there is no ground upon which to conclude that a "termination" was accomplished. Respondent effectively reformed the FPD by dividing it into two such districts. "Termination" however, means to "end in time or existence" (Merriam-Webster's Collegiate Dictionary 1289 [11th ed 2003]; see People v Aleynikov, 31 NY3d 383, 397 [May 3, 2018] ["When a word used in a statute is not defined in the statute, dictionary definitions serve as useful guideposts in determining the word's ordinary and commonly understood meaning" (internal quotation marks omitted)]), and I question how a "termination" could have been accomplished here inasmuch as all of the areas covered by the original FPD still are covered by the replacement [*8]FPDs. To that end, a "plain language" analysis {**31 NY3d at 599}of the statute (that is, an exercise of statutory interpretation)[FN3] should resolve this case in petitioners' favor.
Statutory Construction
Even if we were to resort to legislative history to determine the meaning of "termination" (that is, an exercise of statutory construction), the result would be the same.
As noted, article 17-a of the General Municipal Law considers the consolidation and dissolution of local government. Under the majority's view of this case, a Town Board seeking to maintain FPD coverage (or a similar municipal structure) could effectively "wait out" or fatigue an electorate seeking to dissolve such a body by reconstituting an FPD following a successful dissolution effort. That is, the majority's ruling leaves open the possibility that a town board could simply replace a "dissolved" FPD with another like FPD and challenge the electorate either to repeat the referendum process or to attempt to change the constitution of the board so that such body might become more favorable to a dissolution referendum.
Or, a devious town board could take the extreme step of creating a significant number of FPDs (in this example, I will use the number 10) to replace a "dissolved" FPD. In that scenario, the electorate would need to not only recommence the referendum process (and likely to change the makeup of the Town Board), but to engage in multiple referendum efforts where previously only one such effort would have been required. The degree of difficulty in achieving dissolution obviously{**31 NY3d at 600} increases with the number of required referendum efforts.
Additional Considerations
[*9]
Finally, respondent appears to suggest that an FPD is in the best interests of the Town. What constitutes the best interests of the Town should be left to the voters.[FN4]
The Town Board's decision amounted to a breach of the relevant parts of the General Municipal Law. Consequently, because respondent merely replaced the existing FPD with two substitute FPDs, it did not "dissolve" the FPD and it breached its obligation under General Municipal Law article 17-a to terminate the FPD. The Appellate Division order should be reversed and the petition granted.
Chief Judge DiFiore and Judges Stein, Garcia, Wilson and Feinman concur; Judge Fahey dissents in an opinion.
Order affirmed, with costs.

Footnotes

Footnote 1:The Act requires more signatures to force a permissive referendum on a dissolution plan (25% of electors or 15,000 signatures, whichever is less) than to compel the initial referendum on dissolution (10% of electors or 5,000 signatures, whichever is less, except that where there are fewer than 500 electors, 20% must sign) (compare General Municipal Law § 785 [3], with § 779 [2]).

Footnote 2:General Corporation Law § 3 defined a "district corporation" to "include[ ] any territorial division of the state, other than a municipal corporation . . . which possesses the power to contract indebtedness and levy taxes or benefit assessments upon real estate or to require the levy of such taxes or assessments" (former General Corporation Law § 3 [3]; see also General Construction Law § 66 [3] [recodifying same]).

Footnote 3:Part of the Town has long been situated in the separate Great Bend Fire District. That part of the Town receives fire protection from the Great Bend Fire Department, and is not at issue in this litigation.

Footnote 4:The dissent implies that the manner by which a town's residents should be provided with fire protection services "should be left to the voters" (dissenting op at 
600). In fact, this question is consigned by law in the first instance to the town board, not to the voters (see Town Law § 170 [2]), and the Act does not change this. In any case, the voters here could have required the Town Board to consider the creation of an FD, and could have prevented the implementation of the Plan and the creation of the two FPDs, if they had gathered sufficient signatures (see Town Law § 171 [1]; General Municipal Law § 785). This is not voter fatigue (see dissenting op at 
599), but simply the way our democracy works.

Footnote 5:The dissent suggests that our ruling might allow a "devious town board [to] take the extreme step of creating a significant number of FPDs . . . to replace a 'dissolved' FPD," but our analysis requires no such outcome (dissenting op at 
599). Here, unlike in the dissent's hypothetical, there is no evidence that the Town Board sought to subvert the will of the voters instead of making a political decision—which it was empowered to make—about how best to provide the Town with fire protection services. With this opinion, we resolve the case at bar, and do not rule on other possible cases or hypotheticals.

Footnote 6:Petitioners and the dissent assume that, because the voters petitioned to dissolve the CFPD in particular, they must have intended to eliminate any FPDs the Town Board might contemplate. This assumption is belied by the facts, as the voters did not attempt to petition for the establishment of an FD, nor did they gather sufficient signatures to cause a permissive referendum to be held on the Plan, which created the two new FPDs.

Footnote 1:In a fire protection district, "[n]o independent entity is created thereby; the town controls the district's operations" (Nelson v Garcia, 152 AD2d 22, 24 [4th Dept 1989]). By "contrast, where a town establishes a fire district, it creates a wholly independent political subdivision whose 'members', including its volunteer firemen, are employees of the district and not of the town" (id. at 24-25).

Footnote 2:In fact, according to the plan, fire protection services in the "new" FPDs would be provided by the fire department of the Village of West Carthage (in "new" FPD 1) and by the Village of Copenhagen (in "new" FPD 2). That is, in establishing the "new" FPDs, respondent chose not to procure fire protection services from the Champion Volunteer Fire Company, Inc., of which petitioner Jennifer Waite is a volunteer member.

Footnote 3:Statutory interpretation and statutory construction are different exercises. Indeed, the difference in name of the respective exercises of "interpretation" and "construction" reflects a difference in the mechanics and execution of those inquiries. The task of "interpretation" is most akin to the application of the plain language of the statute or code in question. By contrast, "[c]onstruction" is "a process for determining the meaning of statutes [by] drawing . . . conclusions with respect to subjects which lie beyond the direct expression of the text" (McKinney's Cons Laws of NY, Book 1, Statutes § 71). "The process of construction necessarily presupposes doubt, obscurity, or ambiguity, and consequently, where a statute is framed in language so plain as to make an explanation superfluous, one will not be attempted" (McKinney's Cons Laws of NY, Book 1, Statutes § 71, Comment at 138-139 [1971 ed]).
Said differently, although "[t]he term 'construction' is frequently and commonly used as being synonymous with 'interpretation[,]' . . . there is a technical difference between the two. 'Interpretation', strictly speaking, is limited to an exploration of the written text, while 'construction' properly goes beyond [the text] and may call in the aid of extrinsic considerations" (id.).
Footnote 4:The majority's conclusion that to divide, but not to dissolve, a local government entity targeted in a proceeding pursuant to General Municipal Law article 17-a is not to fatigue voters and instead simply is a reflection of "the way our democracy works" (majority op at 
594 n 4) is misguided. Respectfully, I see this as a subtle attempt to subvert the democratic process (cf. majority op at 
594 n 4).